**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**The Estate of Usaamah Abdullah Rahim**

**by**

**Rahimah Rahim, in her capacity as Personal Representative of the Estate of Usaamah Abdullah Rahim,**

**Plaintiff**

**V.**

**United States of America & John Does, Nos. 1-7** ***Identity and Number of whom is Presently Unknown to the Plaintiff*****,**

**Defendants**

**Civil Action No.**

# COMPLAINT

## I. INTRODUCTION

1. The Estate of Usaamah A. Rahim files this complaint, pursuant to the Federal Tort Claims Act, 28 U.S.C. s. 2671, et. Seq Chapter 229 of the Massachusetts General Laws and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 43 U.S. 388 (1871), against the United States of America, agents of the Boston Office of the Federal Bureau of Investigation (herein after "FBI"), Boston Police Officers, acting under the authority of the FBI and its Joint Terrorism Task Force, in connection with this incident and operation.

2. Plaintiff seeks redress for the unlawful seizure, assault, battery, and murder of Usaamah Abdullah Rahim ("Mr. Rahim"). As proximate cause of the defendants' acts and/or omissions, Mr. Rahim was wrongfully killed and his rights guaranteed by the Fourth Amendment to the United States Constitution and Massachusetts Law were violated, as were the Estate's rights to redress its grievances in the courts of the United States as guaranteed by the First and Fifth Amendments to the United States Constitution.

3. This action alleges that officers of the Federal Bureau of Investigation, and Boston Police Officers acting under the authority of the FBI and the United States, unlawfully seized, assaulted and killed Usaamah Abdullah Rahim. Additionally, the Complaint alleges that the officers' use of excessive and deadly force constituted negligence. Further, this action is against other officers who were present and failed to prevent the death of Mr. Rahim, and against those supervisory officials, including but not limited to members of the FBI's surveillance team, whose actions, inaction, and policies and customs were the proximate cause of the seizure, assault, battery, and death of Mr. Rahim.

4. Plaintiff further alleges that defendants acted negligently and recklessly in their excessive use of force, and deadly force, when attempting to seize Mr. Rahim.

## II. <u>JURISDICTION AND VENUE</u>

5. This case is brought to recover damages from certain defendants caused to the plaintiff, while those defendants were acting under the color of law of the United States of America, by depriving the plaintiff of his rights guaranteed by the United

States Constitution.  These causes of actions are provided for by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

6.     The jurisdiction of this Court is founded upon 28 U.S.C. § 1331, because this case arises under the Constitution of the United States.

7.     This case is also brought to recover damages under the Federal Tort Claims Act, 28 U.S.C. §2671, et seq., alleging that Mr. Rahim's death was caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to plaintiff in accordance with the laws of the Commonwealth of Massachusetts.

8.     The jurisdiction of this Court is founded upon 28 U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act, 28 U.S.C. §2671, et seq.

9.     The jurisdiction of this Court is founded upon 28 U.S.C. § 1367, because the Complaint states causes of action so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

10.     On May 26, 2017, the plaintiff duly presented Notices of Tort Claims, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. §2401, and 28 C.F.R. §14.1, et seq., giving notice of Mr. Rahim's injuries and wrongful death caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under

circumstances where the United States, if a private person, would be liable to the plaintiff in accordance with the laws of the Commonwealth of Massachusetts.

11. Although the claims referenced in the previous paragraph have not been denied, the United States Government has failed to act on the claims within six months from the date the claims were presented. Therefore, the plaintiff elects to treat these claims as having been denied.

12. Venue is proper in the District of Massachusetts under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims of the plaintiff occurred in the District of Massachusetts.

## III. PARTIES

13. Rahimah Rahim, in her capacity as Personal Representative of the Estate of Usaamah A. Rahim brings this action on behalf of the Estate. The Personal Representative is duly qualified and duly authorized to maintain this action.

14. The United States of America ("United States") is a defendant in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. arising from the acts and/or omissions of employees and agents of the Federal Bureau of Investigation ("FBI"), an agency of defendant, and a party defendant for claims arising from Chapter 229 of the Massachusetts General Laws in which individual agents of the FBI, or local law enforcement officers acting under the direction of the FIB, are named as defendants for negligent or wrongful acts or omissions while acting within the scope of their office or employment by the FBI, a federal agency pursuant to 28 U.S.C. § 2671 et seq.

15. Defendants' employees, as well as Boston Police Officers were acting under the direction of the FBI in Boston, Massachusetts. During all times alleged in this

complaint, individual defendants were acting within the scope of their office or employment as agents of the FBI.  Officers are sued sued individually and in their official capacity. During pertinent times alleged in the Complaint, all law enforcement officers were either local Boston Police Officers, acting under the authority of the FBI, or FBI agents.

16.    John Does Nos. 1-7, persons presently unknown to the plaintiff, violated the plaintiff's rights as guaranteed by the United States Constitution and Massachusetts law and/or conspired with others to do so.  The exact number of individuals involved in this incident are unknown at this time, as Plaintiff has not been provided with this information. The John Does may be private individuals, state officials or agents of the United States Government who acted in concert with the federal officials named in this Complaint to deny plaintiff his rights guaranteed by the United States Constitution and Massachusetts law.  John Does also include "BPD-1" and "FBI-1," who are believed to be the actual shooters in this matter.  Based on information and belief, the John Does and other persons, both known and unknown, actively participated in this operation, and were involved in this incident as officers who seized, assaulted, and fatally shot Mr. Rahim.  Plaintiff believes that the conduct and statements of these individuals alleged herein are admissible against the named defendants, but further states that it may request leave to amend the Complaint as appropriate.

## IV. FACTS

17. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

18. On June 2, 2015, Mr. Rahim was shot and killed in a CVS parking lot, located at 4600 Washington Street, in the Roslindale Section of the City of Boston.

19. According to a report prepared by Suffolk County District Attorney, Daniel F. Conley, on August 24, 2016, regarding the Shooting Death of Usaamah Abdullah Rahim ("Suffolk County District Attorney Report"), the Boston Joint Terrorism Task Force ("JTTT") had been investigating Mr. Rahim as of May 2015, and believed he was planning to kill a particular person.

20. A law enforcement officer, who was/is a part of the Federal Bureau of Investigations ("FBI") Joint Terrorism Task Force ("JTTF"), and a Boston Police Officer acting under the direction of the FBI and JTFF, shot and killed Mr. Rahim.

21. The Boston Police Officer, acting under the direction of the FBI JTTF, who shot and killed Mr. Rahim is referred to as "BPD-1,", and the FBI agent who shot also shot and killed Mr. Rahim is referred to as "FBI-1," in the firearm discharge reports and the Suffolk County District Attorney Report.

22. The law enforcement officers who approached Mr. Rahim consisted of officers of the Boston Police Department, acting under the authority of the FBI, as a part of the FBI Joint Terrorism Task Force, and Federal Agents who were a part of the surveillance team and Joint Terrorism Task Force of the FBI.

23.    The involved officers, John Does, approached Mr. Rahim with their service weapons.  Multiple law enforcement officers stopped Mr. Rahim with their weapons drawn.

24.    On the morning of June 2, 2015, officers of the JTTF were conducting surveillance of Mr. Rahim.  Officers had been surveilling Mr. Rahim and suspected that he was going to commit acts of terrorism in the United states.

25.    Investigators allegedly believed that in preparation for an attack, Mr. Rahim had purchased three (3) military-style knives. JTTF alleged that Mr. Rahim had ordered three hunting knives over the internet and that the knives were delivered to his home between May 27 and May 30, 2015.  The JTTF allegedly believed that the knives were going to be used to kill a particular person.

26.    The FBI alleged that it intercepted one such order, x-rayed it to confirm that it contained a large knife and then watched as the package was delivered to Mr. Rahim's home.

27.    Despite their belief that Mr. Rahim planned to kill someone and had bought three (3) large knives to use in an alleged planned killing, the JTTF did not arrest Mr. Rahim, no were there criminal charges or a warrant against Mr. Rahim.

28.    According to reports, the JTTF believed that Mr. Rahim was "likely in possession of one or more" of the knives.  The JTTF believed that this information "significantly raised the threat level posed by Mr. Rahim."

29.    As a part of their surveillance, JTTF agents and officers were listening to recorded telephone conversations between Mr. Rahim and an alleged co-conspirator. According to the Suffolk County District Attorney Report, by about 5:00 A.M. on June 2,

2015 the JTTF believed that Mr. Rahim had abandoned his initial plans and now planned to "commit a terrorist attack immediately in Boston," against one of the "boys in blue." This was a term which agents believed to reference police officers.

30.    After this conversation, a supervisor of the JTTF notified the surveillance team, and due to the alleged belief of imminent threat of law enforcement officers, the surveillance team planned to stop Mr. Rahim for questioning and bar him from boarding public transportation.

31.    According to the Suffolk County District Attorney's Report, a JTTF supervisor notified the JTTF surveillance team that they should "stop Mr. Rahim for questioning."

32.    In his report, the Suffolk County District Attorney said that that the police had probable cause to arrest Mr. Rahim for federal "terrorism-related charges . . . as well as a variety of state charges including conspiracy to commit murder."

33.    The JTTF did not arrest Mr. Rahim.  Instead, according to the report, the JTTF kept up surveillance on Mr. Rahim.  They watched him briefly leave his home at about 6:53 a.m. on June 2, 2015, go to the CVS store near his home, go inside, then return to his home.  Then again at 7:00 A.M, he left his home.

34.    According to the Suffolk County District Attorney's Report, the JTTF believed that Mr. Rahim would be armed with a knife when he left home again.  Boston Police Detective Nicholas Moore said that at 6:59 a.m., he heard a radio request for police to come "for a person about to exit a residence on Blue Ledge Drive armed with a knife." Mr. Rahim lived on Blue Ledge Drive.

35. According to the Suffolk County District Attorney's Report, at about 7:15 a.m., a Boston police detective identified as BPD-1 approached Mr. Rahim on a busy public street and "asked if he could speak with him." FBI-1 believed that BPD-1 intended to conduct a "Terry Stop" of Mr. Rahim. FBI-3 "was aware that the plan of action was to conduct a 'Terry Stop' of Rahim."

36. Dispatch recordings indicate that at a call was made by a law enforcement officer referred to as "Victor" (last name unknown due to redaction), in the transcription of the recordings, made a call to "start a few marked cars to Blue Ledge Drive at Stony Brook," and that law enforcement officers intended to "stop a guy armed with a knife." The officer noted that there was going to be a "gentleman, a black male … coming out now armed with a knife. The detectives are going to stop him. If we can get a few marked cars in there to assist." (Pages 2/3 – Dispatch Recordings).

37. The dispatcher ("Dispatch") then asked the officer ("Victor") whether the gentleman is wanted for an arrest or FIO (Field Interrogation Observations) purposes. Dispatch did not receive a response regarding this issue. Instead, Victor stated that "we're going to stand down on that for now. If we can just get a couple cars in the area but stand down on that, be in the area, stand back." (Page 3 – Dispatch Recordings).

38. Victor then asked the dispatcher to tell the units in the area to not go into Blue Ledge development and be in a holding pattern for a minute or two minutes. (Page 4 – Dispatch Recordings).

39. The dispatcher relayed this information to the appropriate units, then spoke to Victor again. At this time, Victor stated:

> "Yes, ma'am those units that are on-call on site near the Roslindale incident where we were speaking of earlier, can you have those units know to be aware

> that if they can just stay short of the Burger King and keep an eye in the bus stop that's right in front of the CVS/. If our subject is making his way here now, we're going to take him out at that spot. We'll just need them to come for backup. It will be plain clothes units, about four, taking a black male right in front of that bus stop, and that should be happening in the next few minutes."
>
> (Pages 5-6 – Dispatch Recordings).

40. The next set of communication in the Dispatch Recordings reflects that shots were fired. (Page 6 – Dispatch Recordings).

41. According Suffolk County District Attorney's Report, two (2) law enforcement officers shot and killed Mr. Rahim. According to the report, BPD-1 fired a single round towards the center of Mr. Rahim's torso. A second task force officer, referred to herein as FBI-1, fired two additional rounds. All three rounds struck Mr. Rahim. Mr. Rahim was pronounced dead at 7:53 AM.

42. The Medical Examiner determined the cause of death to be 'Gunshot wounds of torso and lower extremity' and the manner of death to be 'Homicide (Shot by Police).

43. According to an interview with an Emergency Medical Technician ("Interview with EMT"), whose name is redacted in the transcription provided to the decedent's mother, the ambulance and emergency personnel arrived on the scene at approximately 7:30 A.M.

44. Mr. Rahim was bleeding from his chest and on the ground. The EMT reported that Mr. Rahim was conscious at this time and stated "I can't breathe." (Page 4 – Interview with EMT).

45. The EMT noted that in the area, a backpack was observed, but that "there was nothing else that we saw."

46.    The Suffolk County District Attorney's Report alleges that Mr. Rahim was holding a military style knife.

47.    The reports regarding the aftermath investigation in this incident, provide inconsistent and conflicting information regarding where Mr. Rahim allegedly "pulled" a knife from.

48.    A sheath was recovered from the ambulance that transported Mr. Rahim to the hospital, however a latent print analysis did not recover latent finger prints from the sheath.

49.    The Boston Police Department also processed the Ontario Knife Company Model SP6 Fighting Knife, alleged to have been found at the scene.  No latent prints were recovered on the knife.

50.    According to the Suffolk County District Attorney's Report, as officers approached Mr. Rahim with their weapons holstered, Mr. Rahim was on the cellular telephone, speaking with brother, and then his father.

51.    Mr. Rahim was speaking to his father as the surveillance officers approached him.

52.    This conversation between Mr. Rahim and his brother, then father was recorded, and according to the Suffolk County District Attorney's Report, Mr. Rahim allegedly stated in the conversation to his bother: "unfortunately, you will not be seeing me again."

53.    After the incident, specialized personnel from the Boston Police Department responded to the scene to collect any video evidence that may be relevant to the incident.

54.   Due to the quality of the video which was most significant in this incident, it Is not clear what is in each individual's hand during the time law enforcement officers approached Mr. Rahim

55.   Law enforcement officers approaching Mr. Rahim knew that they intended engage in the use of excessive and/or deadly force when approaching Mr. Rahim, as he was walking in public.

56.   To date, the name of the law enforcement officers who shot and killed Mr. Rahim, and numerous other law enforcements officers involved in the operation and subsequent investigation of this matter, have not been provided to Mr. Rahim's family, or prior counsel representing Rahimah Rahim, Mr. Rahim's mother.

57.   Many of the reports and transcripts of interviews contain redactions, as it pertains to information and in particular, officers' and agents' and witnesses' names.

58.   At the time of the incident, BPD-1 was a 27-year veteran of the Boston Police Department. BPD-1 was promoted to Detective in 2007 and assigned to the Boston Police Regional Intelligence Center.  For the past 5 years preceding the incident, BPD-1 was assigned to the FBI Joint Terrorism Task Force.

59.   FBI-I was appointed as a Special Agent of the Federal Bureau of Investigation in 2014. FBI-I was a twelve-year military and combat veteran prior to joining the FBI.

60.   Usaamah Abdullah Rahim had no criminal history in the State of Massachusetts and a query of the NCIC records revealed no criminal history in the United States. At the time of the incident, he was employed as a loss prevention person for CVS Pharmacy in Mattapan, Massachusetts.

61. The only references to Mr. Rahim in Boston Police Incident Reports are those filed in connection with his duties in loss prevention at various commercial businesses.

**COUNT I: NEGLIGENCE – M.G.L 229 § 2 – Negligence**

62. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

63. The defendants, including John Does 1-7 (encompassing FBI-1 and BPD-1), knew or should have known that approaching Mr. Rahim in the manner which they chose, with approximately seven (7) officers and guns drawn, enhanced the risk of deadly force, and was contrary to good police procedure.

64. The defendants failed to approach Mr. Rahim in a safe manner. Instead, they approached him in public, with weapons drawn, thereby enhancing the risk and hazard of deadly force.

65. As a result of the wrongful by agents and employees of the Defendant, United States, events that occurred that a reasonable prudent person would have foreseen in light of the circumstances set forth herein, including the assault, battery, and fatally shooting and wrongful death of Mr. Rahim. The tortious conduct of such employees was a material element and proximate cause in bringing about Mr. Rahim's seizure, assault, battery, and death. Plaintiff alleges that the defendants' actions were not objectively reasonable in light of the circumstances.

**COUNT II: Wrongful Death – Willful**

66. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

67. On or about June 2, 2015, Defendants John Does (including FBI-1 and BPD-1), acting under the direction of the United States, and FBI JTTF unit, willfully, wantonly, maliciously and unlawfully killed Usaamah Abdullah Rahim by approaching Mr. Rahim with the premediated thought to shoot and kill him.

68. By reason of John Does (including FBI-1 and BPD-1)'s willful, wanton and wrongful, and reckless acts, the next of kin and family of Mr. Rahim have been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229 § 2.

69. By reason of John Does (including FBI-1 and BPD-1)'s willful, wanton, wrongful and reckless conduct, the plaintiff is entitled to an award of punitive damages pursuant to MGL Ch.229§2.

**COUNT III: BIVENS – Fourth Amendment**

70. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

71. Defendants John Does 1-7, while acting under color of law of the United States of America, knowingly, intentionally, and with actual malice, denied Mr. Rahim his clearly established right to be secure in his person against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution.

72. These denials were accomplished in that defendants used excessive and deadly force when seizing Mr. Rahim.

73. When numerous law enforcement officers approached Mr. Rahim with their guns already drawn as they approached him, he was in effect seized and excessive force was used during the stop, and seizure of Mr. Rahim.

74. The officers' response to Mr. Rahim, allegedly standing with a knife, was not reasonable in the circumstances. Particularly the area which Mr. Rahim was shot, was not reasonable given the circumstances, as he was holding a knife, and not a gun.

75. These actions violated Mr. Rahim's clearly established right to be secure in his person from unreasonable seizures, guaranteed by the Fourth Amendment to the United States Constitution, that is, force which was, considering all the facts and circumstances of the case, unreasonable in that it was not intended to achieve any lawful purpose.

76. As a direct, proximate, and foreseeable result of the actions of defendants, Mr. Rahim was actually denied his Constitutional rights pursuant to the Fourth Amendment to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

77. The actions of defendants John Does 1-7 were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences. As a result, the plaintiff is entitled to an award of punitive damages.

## <u>COUNT IV: Assault</u>

78. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

79. The Defendant, the United States and John Does 1-7 (including FBI-1 and BPD-2), acting employees and/or agents of the United States, approached Mr. Rahim with their guns drawn, and were the direct and proximate cause, and subjected Mr. Rahim, to be in fear of imminent physical harm on or about June 2, 2015.

**COUNT V: Battery**

80. Each of the preceding paragraphs is incorporated in this section as if fully set forth herein.

81. The Defendant, the United States and John Does 1-7 (including FBI-1 and BPD-2), acting employees and/or agents of the United States, approached Mr. Rahim with their guns drawn, and fatally shot Mr. Rahim three (3) times on or about June 2, 2015.

WHEREFORE, the Plaintiff requests that this Honorable Court:

1. Award judgment against the Defendant. Plaintiff requests that the judgement be entered against the Defendants in the amount that will fairly and adequately compensate Plaintiff for all recoverable damages, together with interest, costs and such other relief as this Honorable Court may deem appropriate;
2. Award punitive damages against the Defendants;
3. Award reasonable attorney fees; and
4. Award the Plaintiff any such other and further relief as the Court deems just and proper.

**A JURY TRIAL IS REQUESTED ON ALL ISSUES SO TRIABLE.**

Dated: June 1, 2018

Respectfully Submitted
The Estate of Usaamah A. Rahim
By Its Attorneys

Joseph B. Simons, BBO# 684030
Sara Attarchi, BBO# 697486
SIMONS LAW OFFICE
1 International Place, #1400
Boston, MA  02110
(617) 292-6260
joe@jbsimonslaw.com
sara@jbsimonslaw.com

# EXHIBIT A

Dispatch Recordings dated June 2, 2015, pages 1-6

Pages 1-88

COMMONWEALTH OF MASSACHUSETTS

*****************************

RE: POLICE OFFICER SHOOTING

OF USAAMAH RAHIM

ON JUNE 2, 2015

*****************************

DISPATCH RECORDINGS

Prepared for:

Ed Zabin, Esquire

Suffolk County DA Office

One Bulfinch Place

Boston, Massachusetts 02114

TRANSCRIPTION

DISPATCHER: Victor call in.

SPEAKER: Victor [redacted].

DISPATCHER: I'm sorry, it's a little scratchy. Is that Victor 940? Operation to Victor 940.

SPEAKER: No, that's the Victor [redacted]. Can I start a few marked cars to Blue Ledge Drive at Stony Brook, we need some detectives. We're going to stop a guy armed with a knife.

DISPATCHER: Blue Ledge Drive and Stony Brook, did you say somebody's there armed with a knife?

SPEAKER: Yeah, we have a gentleman, a black male, 6 feet, beard, 240, 20s, going to be coming out now armed with a knife. The detectives are going to stop him. If we can get a few marked cars in there to assist.

DISPATCHER: Okay, units over at Stony Brook and Blue Ledge for a black male about 6 feet in his 20s, armed with a knife. For you to head over there please, at Stony Brook, Blue Ledge Drive.

SPEAKER: 103, we're heading over.

DISPATCHER: All right, 103, I got it.

SPEAKER: [redacted] is in route.

DISPATCHER: [redacted], I got it.

SPEAKER: Echo 903.

DISPATCHER: Echo 903.

SPEAKER: Is this gentleman wanted for an arrest, for FIO purposes?

DISPATCHER: Victor [redacted]

SPEAKER: [redacted] and be aware there's about six undercover officers there.

DISPATCHER: So be aware there's about what?

SPEAKER: There's six undercover officers there, plain clothes officers.

SPEAKER: Victor [redacted], is this guy good to go?

SPEAKER: 209 (inaudible).

SPEAKER: Victor [redacted] to operations.

DISPATCHER: Unit call operations.

SPEAKER: I'm that unit on site over there in that -- stand by, ma'am.

SPEAKER: Victor [redacted], we're going to stand down on that for now. If we can just get a couple cars in the area but stand down on that, be in the area, stay back.

DISPATCHER: All right, Victor [redacted], you're saying stand down. I do the Echo 103, I have the [redacted] headed up that way. But you're saying stand down. He may be in the area.

SPEAKER: Yeah, no lights, no sirens, please. No lights, no sirens. And just roll in that way and we'll get right back to you.

DISPATCHER: All right, sir. Echo 103, [redacted], are you copied?

SPEAKER: [redacted], has it.

SPEAKER: 103 has it. Now do we have a description of that guy yet?

DISPATCHER: Black male, about 6 feet tall in his 20s. I had no clothing description.

SPEAKER: Echo 903.

DISPATCHER: Echo 903.

SPEAKER: Take me off in that area of Blue Ledge.

DISPATCHER: Yes, I have it.

SPEAKER: Yes, [redacted], tell those units please don't go into the Blue Ledge development and be in a holding pattern for a minute here, two minutes.

DISPATCHER: All right, Victor [redacted]. Echo units, please don't go inside the Blue Ledge development.

SPEAKER: Echo 202, we've arrived if we're needed anyway.

DISPATCHER: 202, come in again.

SPEAKER: Please advise if we're needed anywhere in that area.

DISPATCHER: Right now Victor [redacted] said stand down, so I do have a couple of Echo units up there. Echo 903 is there, sir, so far.

SPEAKER: Victor [redacted], dispatcher, what's your number?

DISPATCHER: I'm at 5464 but you can call 4680 and they'll transfer you straight to me, sir.

SPEAKER: Okay, okay.

SPEAKER: Echo [redacted], go up to 7.

DISPATCHER: Operation Echo 903, going up.

SPEAKER: 903 answering.

DISPATCHER: Sir, if you're able to call 4680 and have them transfer me, transfer you over to 5464.

SPEAKER: I have it.

SPEAKER: [redacted] is on 7.

SPEAKER: Echo 437, go to 7.

SPEAKER: I'm on 7 as well, sir.

SPEAKER: Victor [redacted] to operations.

DISPATCHER: Victor [redacted].

SPEAKER: Yes, ma'am, those units that are on-call or on site near the Roslindale incident

where we were speaking of earlier, can you have those units know to be aware that if they can just stay just short of the Burger King and keep an eye in the bus stop that's right in front of the CVS sign. If our subject is making his way here now, we're going to take him out at that spot. We'll just need them to come up for backup. It will be plain clothes units, about four, taking a black male right in front of that bus stop, and that should be happening in the next few minutes.

SPEAKER: Echo 103, go to 7.

SPEAKER: Going up.

DISPATCHER: Echo 103, Echo 903, [redacted], you did copy with the Victor [redacted], that bus stop.

SPEAKER: I have it. I hope she has it.

DISPATCHER: Thank you, thank you.

SPEAKER: [redacted] has it.

SPEAKER: [redacted] can we get some help up here?

DISPATCHER: [redacted], are you at that bus stop in front of CVS? Echo 202, can you head in, please?

SPEAKER: Yeah, I'm heading in.

SPEAKER: Echo 903 is up there, Echo [redacted].

SPEAKER: 7, yeah, shots fired.

DISPATCHER: All right, shot fired, units, she

# EXHIBIT B

EMT Interview dated June 2, 2015

Pages 1-11

ORIGINAL

COMMONWEALTH OF MASSACHUSETTS

*******************************

RE: INVESTIGATION INTO DEATH
OF USAAMAH RAHIM
ON JUNE 2, 2015

*******************************

INTERVIEW OF EMT [redacted]

DATE: June 8, 2015

PRESENT:

EMT [redacted]

Sergeant Detective John Ford

Detective James Morrissey

```
1                    INTERVIEW OF EMT ███████

2              SGT. DET. FORD:   The time is

3       approximately 10:47 p.m.   The date is June 8,

4       2015.   The speaker is Sergeant Detective John

5       Ford, District B-3, and assigned to the Boston

6       Police Firearms Discharge Investigation Team.

7       We're in the second floor interview room at

8       District B-3, and I'll ask the other parties in

9       the room to introduce themselves for the record,

10      please.

11              DET. MORRISSEY:   Detective James

12      Morrissey.

13              SGT. DET. FORD:   Ma'am?

14              MS. ████:   ███████████.

15  BY SGT. DET. FORD:

16  Q   And can you spell your last name for me, ██████?

17  A   █████████

18  Q   Okay.   And ████████ are you employed?

19  A   Yes.

20  Q   Who do you work for?

21  A   Boston EMS.

22  Q   And going back to June 2nd, were you working that

23      night/day?

24  A   Yes.

25  Q   Okay.   What was your shift that day?
```

A Midnight to 8:00 a.m.

Q Okay. Um, and you were dispatched to a call in Roslindale, Massachusetts?

A Yes.

Q Okay. What was the nature of the call?

A It was a shooting.

Q Okay. Did they give you any other information about it?

A No. Just a shooting.

Q Just a shooting, okay. I don't know what address they used. We've been using 4600 Washington Street which is the CVS.

A Yeah, we were at the CVS.

Q Okay. About what time did you arrive on the scene?

A Oh, gosh, I want to say around 7:30, somewhere in and about, give or take.

Q Okay. And who was your partner?

A [redacted] (phonetic).

Q Okay. Now, was there paramedics on the scene also or --

A The paramedics were on the scene. We arrived first, they arrived after, after us, and there was also a Tango unit that was there prior to us.

Q Okay. Just describe for me what you saw when you

arrived.

A Um, so a young black male, lying supine on the concrete, um. We had his shirt cut off at that point. He was bleeding from the chest. He had an occlusive dressing on his wound.

We moved very quickly. My partner had put his jump bag down on the left of the patient. The Tango unit was working on the patient's right side. We had our backboard on the left side of the patient. We rolled him onto his right side, got him on the backboard that way, put him on our stretcher and got him right to the back of the ALS truck.

Q Okay. Was he conscious at this point?

A He was conscious and he wasn't really, he wasn't really saying anything, with the exception of: I can't breathe. Aside from that, there was nothing.

Q All right. In the area did you notice anything around where he was laying?

A There was a backpack, I want to say off to his left side but up towards his head. And aside from that, there was nothing else that we saw. We hadn't cut his pants off yet. We wanted to get him off the street and get him going because of

his injury.

Q Okay. Did you cut the backpack off?

A We did not.

Q Okay.

A The Tango unit may have. He was first on the scene. I would say he was probably there for three or four minutes prior to our arrival.

Q Okay. The clothing, some clothing that was cut off was left on the scene, is that correct?

A Yes, his upper, upper clothing, so everything from the waist up.

Q Okay. And then when he got to the hospital, did you retrieve clothing items or?

A Um, when we got to the hospital, he had a headset that I don't know, had fallen out of his pants or something. That was in the ALS truck. And then in our ambulance once we went to clean our ambulance up, there was a sheath to a knife that was on our stretcher, and so essentially when I picked up my partner's trauma bag, I scooped it up and threw it on our stretcher because we were moving fast and it was very chaotic.

Q Okay.

A At that time I noticed the sheath, I picked it up with gloves, walked it into the emergency room.

There was a detective there with my deputy Sue Schiller, explained to him what had happened, just kind of -- it was right, right on the side of the jump bag and when I scooped everything up, it just came with us. I took it out of our ambulance, gave it right to the detective and it was -- he took my name. It was documented.

Q Okay. Describe that item for me.

A So it was the sheath to a knife that appeared to me to be at least 6 inches in length. It was militaristic looking. It had the ties on the side so it could actually be tied to the leg. Aside from that, there wasn't anything on it. There was no blood. It looked fairly new. It wasn't used a whole heck of a lot. Black.

Q When you -- when it was scooped up, did you have gloves on at that time?

A I did, yes.

Q Okay. Do you recall the name of the officer you turned it over to?

A I don't know his name.

Q Was he uniform or detective?

A He was a detective.

Q Okay.

A If I saw him again, I would recognize him.

Q Okay.

A I know he works in the area. I've seen him before and I've been on calls with him.

Q Okay. So during the transport, he said nothing?

A No, no. He said: I can't breathe, which clearly we knew that because of the location of his gunshot wound was definitely going to be an issue because of the proximity to his lung. Aside from that, there was nothing. He didn't say anything, except for "I can't breathe." He -- he was not super compliant with care, which doesn't surprise me. And we just tried to, tried to get him calmed down. He didn't reply to anything that we were saying, you know.

Q Did you notice him at the scene struggling? Did he have to be restrained at all at the scene?

A We did have to remove his hands. He was bringing his hands up in front of him. We did have to remove his hands a couple times, but at that point he was more directable. Once we got him in the back of the ambulance, he just progressively became less directable, most likely due to the hypoxia.

Q Okay. Any of the law enforcement personnel on the scene, did they update you or speak to you at all

or --

A No, no. Like I said, we moved very, very quickly. The Tango unit was already there. He had done everything that we would have done, so by the time we arrived it was very quick, get him on the backboard, get him on the stretcher and get him going. Any chance at helping him was definitive care at the emergency room, probably in OR. We knew that was the best thing we could do for him.

Q Okay. And he went to what hospital?

A Brigham and Women's.

Q Brigham and Women's, okay.

SGT. DET. FORD: I don't have anything else. Do you have anything else?

BY DET. MORRISSEY:

Q What's a Tango unit?

A The Tango unit is someone who drives around, they're alone, so they don't have a partner and they're not in an ambulance. They're in more of a supply unit kind of thing. They have special equipment that we don't necessarily have. They go mostly to fires and big events and stuff like that.

Q Are they paramedics or EMTs?

A I believe that they're both. They can be either

paramedics or EMT's. This particular Tango unit was staffed I believe by an EMT.

BY SGT. DET. FORD:

Q Okay, just I wanted to clarify. When you said you grabbed the stuff and you threw it on the backboard, where did that go? Whose ambulance was that in?

A That was in my ambulance that I drove.

Q So that was the BLS truck?

A That's right.

Q And then you guys, everybody jumped in?

A So we, we jumped into the ALS truck, attempted to care for the patient. Once we established that we just needed to go, I got back into my ambulance by myself. My partner drove the ALS ambulance.

Q So nobody was in the back of the ALS truck with any -- there was nobody in the truck besides him, nobody was in the ALS truck?

A Patient-wise?

Q Yeah.

A No.

Q So the only person in the ALS truck was your partner?

A Um, no, it was the two paramedics as well.

Q Okay.

A So the two paramedics, when we transported to the hospital, the two paramedics stayed in the back of the ambulance. My partner drove the ALS ambulance. I drove my BLS ambulance alone. I tailed the ALS ambulance.
Q Did anybody -- did you notice that item when you arrived on the scene on the ground somewhere near the bag?
A No.
Q And did anybody else remember seeing it?
A No.
Q Okay.
A No, it kind of --
Q So do you believe that like that it was so close to the body that the bag just got put down?
A Yeah, right, because we need that bag close to us. That way when we are rendering care, we just -- it's a simple reach. It was a black sheath and a black bag, so it kind of just blended it. And when I scooped it up, I may not even have actually been looking at the bag. I think I just did one of these, toss it on the stretcher and --
Q You were just trying to get him to aid?
A Right.
Q And get out of the scene, okay. Totally

understandable. That is it, we just obviously needed to document how -- where that came from and how it ended up in police custody.

A No problem.

Q And I appreciate you coming in tonight.

A No problem. Any time, guys.

SGT. DET. FORD: We're going to conclude. It is 10:56 p.m.

DET. MORRISSEY: Thanks for your time.

MS. [redacted]: Oh, no problem.

(End.)

RRK

# EXHIBIT C

Claim for Damage, Injury, or Death, dated May 26, 2017

| **CLAIM FOR DAMAGE, INJURY, OR DEATH** | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| | |

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| | | | | |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

11. **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| | |

12. (See instructions on reverse). **AMOUNT OF CLAIM** (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | | | |

**I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.**

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | | |

| **CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM** | **CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS** |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

**INSURANCE COVERAGE**

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance? ☐ Yes If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☐ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☐ No

17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☐ No

**INSTRUCTIONS**

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

**PRIVACY ACT NOTICE**

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.
B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

**PAPERWORK REDUCTION ACT NOTICE**

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

**Attachment to Form 95 – Page 1 of 3**
Submitted to Boston FBI by Rahimah Rahim on behalf of Usaamah A. Rahim
May 26, 2017

On behalf of my son, Usaamah A. Rahim, I am submitting this claim based on the negligence of the FBI that caused the death of my son on June 2, 2015. I have the authority to file this claim on his behalf because I am the Voluntary Administrator of his estate. A copy of the Voluntary Administration Statement is attached.

1. The information given here is based on the report that the Suffolk County District Attorney issued on August 24, 2016. The official title of the report is “Report of Suffolk County District Attorney Daniel F. Conley on Findings in the June 2, 2015, Shooting Death of Usaamah Abdullah Rahim.”

2. I cannot provide the names of witnesses, as requested in Box 11 of Form 95, as most names have been redacted from the report.

3. According to the report, the Boston Joint Terrorism Task Force (JTTT) had been investigating Mr. Rahim and as of May 2015, believed he was planning to kill a particular person (see pages 3 and 51).

4. I do not know the names of the FBI agents who were members of the JTTT. At least six of them are mentioned in the report, referred to as FBI-1 (pages 20-21), FBI-2 (page 21), FBI-3 (pages 21-22), FBI-4 (page 22), FBI-5 (pages 22-23) and FBI-6, the team leader (page 23).

5. According to the report, the JTTF believed that Mr. Rahim had ordered three hunting knives over the Internet and that the knives were delivered to his home between May 27 and May 30, 2015 (page 51). The JTTF believed that the knives were going to be used to kill that particular person (pages 2-3, 57-58).

6. The FBI says that it intercepted one such order, x-rayed it to confirm that it contained a large knife and then watched as the package was delivered to Mr. Rahim’s home (page 59).

7. Despite their belief that Mr. Rahim planned to kill someone and had bought three large knives to use in the killing, the JTTF did not arrest Mr. Rahim.

8. The FBI agents who were part of the JTTF were negligent because they failed to arrest Mr. Rahim even though they believed he planned to commit a violent crime and believed that he had the weapons to do so.

9. According to the report, by about 5:00 a.m. on June 2, 2015 the JTTF believed that Mr. Rahim had changed his plans and now planned to “commit a terrorist attack immediately in Boston” (page 3).

**Attachment to Form 95 – Page 2 of 3**
Submitted to Boston FBI by Rahimah Rahim on behalf of Usaamah A. Rahim
May 26, 2017


10.  According to the report, the JTTF believed that Mr. Rahim was "likely in possession of one or more" of the knives (page 18).  The JTTF believed that this information "significantly raised the threat level posed by Rahim" (page 19).

11.  In his report, the Suffolk County District Attorney said that that the police had probable cause to arrest Mr. Rahim for federal "terrorism-related charges . . . as well as a variety of state charges including conspiracy to commit murder" (page 10).

12.  The JTTF did not arrest Mr. Rahim.

13.  Instead, according to the report, the JTTF kept up surveillance on Mr. Rahim.  They watched him briefly leave his home at about 6:53 a.m. on June 2, 2015, and then leave again after 7:00 a.m. (pages 4, 19, 21).

14.  According to the report, the JTTF believed that Mr. Rahim would be armed with a knife when he left home again.  Boston Police Detective Nicholas Moore said that at 6:59 a.m., he heard a radio request for police to come "for a person about to exit a residence on Blue Ledge Drive armed with a knife" (page 241).  Mr. Rahim lived on Blue Ledge Drive.

15.  According to the report, a JTTF supervisor notified the JTTF surveillance team that they should "stop Mr. Rahim for questioning" (page 3).

16.  According to the report, at about 7:15 a.m., a Boston police detective identified as BPD-1 approached Mr. Rahim on a busy public street and "asked if he could speak with him" (pages 20, 30).  FBI-1 believed that BPD-1 intended to conduct a "Terry Stop" of Mr. Rahim (page 30).  FBI-3 "was aware that the plan of action was to conduct a 'Terry Stop' of Rahim" (page 22).

17.  I do not know the names of the officers who shot Mr. Rahim, but the report lists them as BPD-1 and FBI-1. (See page 15.)

18.  According to the report, these two officers killed Mr. Rahim.  Page 5 says, "BPD-1 fired a single round towards the center of Mr. Rahim's torso.  A second task force officer (who will be referred to herein as 'FBI-1') fired two additional rounds.  All three rounds struck Mr. Rahim."  Page 8 says, "Mr. Rahim was pronounced dead at 7:53 AM . . . The Medical Examiner determined the cause of death to be 'Gunshot wounds of torso and lower extremity' and the manner of death to be 'Homicide (Shot by Police).'"

**Attachment to Form 95 – Page 3 of 3**
Submitted to Boston FBI by Rahimah Rahim on behalf of Usaamah A. Rahim
May 26, 2017

20.  Agent FBI-1 and the other FBI agents who were members of the JTTF were negligent because they waited to approach Mr. Rahim on a public street, after he had left his home.  They missed the opportunity to surprise him and to take him into custody at his home.