# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| The Estate of Usaamah Abdullah Rahim, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff | | |
| V. | | Civil Action No. 1:18-cv-11152-IT |
| United States of America, et al., | | |
| Defendants | | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS OF UNDISPUTED MATERIAL FACTS

Plaintiff, The Estate of Usaamah A. Rahim, pursuant to Local Rule 56.1, respectfully provides responses to Defendants' Statements of Undisputed Material Facts.

1. Defendant John Doe 1 is a Special Agent in the Boston Field Office of the Federal Bureau of Investigation (FBI). Sworn Statement of John Doe 1 ("Doe 1 Stmnt."), at 2 (Ex. 1). ***Admitted.***

2. Defendant John Doe 2 is a Detective for the Boston Police Department (BPD). Sworn Statement of John Doe 2 ("Doe 2 Stmnt."), at 2 (Ex. 2). ***Admitted.***

3. The incident giving rise to this lawsuit occurred on June 2, 2015. Doe 1 Stmnt., at 2 (Ex. 1); Doe 2 Stmnt., at 2 (Ex. 2). ***Admitted.***

4. In the spring of 2015, John Doe 1, John Doe 2, and other members of the FBI Joint Terrorism Task Force (JTTF) were investigating Usaamah Rahim's ties to a foreign terrorist organization – the Islamic State of Iraq and the Levant (ISIL) – and Rahim's preparation to commit acts of terrorism in the United States. Report of Suffolk

County District Attorney Daniel F. Conley on Findings in the June 2, 2015, Shooting Death of Usaamah Abdullah Rahim ("District Attorney's Report"), at 2 (Ex. 3); Doe 1 Stmnt., at 2-3 (Ex. 1); Doe 2 Stmnt., at 2 (Ex. 2). ***Disputed as to Rahim's preparation to commit acts of terrorism in the United States.***

     5.     The JTTF investigation revealed that Rahim and others planned to behead a specific target in New York City at the behest of an ISIL militant. District Attorney's Report, at 2 (Ex. 3); Doe 1 Stmnt., at 2-3 (Ex. 1); Doe 2 Stmnt., at 2 (Ex. 2). ***Disputed as to Rahim's planning to behead a target in New York City at the behest of an ISIL militant.***

     6.     John Doe 1 and John Doe 2 knew that, in preparation for the planned attack, Rahim had purchased and received multiple military-style knives. District Attorney's Report, at 2 (Ex. 3); Doe 1 Stmnt., at 2 (Ex. 1); Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed.***

     7.     At 5:18 a.m. on June 2, 2015, JTTF officers listened to a telephone conversation between Rahim and one of his co-conspirators in the terrorism plot, David Wright. In that conversation, Rahim told Wright that he was abandoning his plan to travel to New York because he needed to "act sooner than anticipated." Instead of the original plan, Rahim expressed his intention to commit a terrorist attack in Boston, where he lived. ***Disputed.*** Specifically, Rahim stated that "I'm just going to uh…I'm going after them, those boys in blue. Because, uh, it's the easiest target and uh, the most common is the easiest for me, and I, insha' Allah [God willing], I'll make it to jannah [paradise], because this dunyah [worldly life] is not worth it, it's not worth it." Recording of June 2, 2015 at 5:18 a.m. call from Wright to Rahim ("5:18 Call"), [00:29-

00:42; 06:02-06:30] (Ex. 4); Transcript of June 2, 2015 at 5:18 a.m. call from Wright to Rahim ("5:18 Transcript"), at 1, 4 (Ex. 5); Declaration of Timothy Darling ("Darling Decl.") ¶ 8 (Ex. 6) (identifying Exhibits 4 and 5). ***Admitted.***

8. Regarding the timing of his attack, Rahim stated that "it will be if-if not today, then tomorrow, insha' Allah [God willing]." He stated that his attack would be "random," "local," and that it "might even happen today." Rahim was determined to "not give it another day." 5:18 Call, [08:17-08:39; 08:48-08:59; 21:45-21:55; 23:40-24:15] (Ex. 4); 5:18 Transcript, at 4-5, 9 (Ex. 5). ***Disputed as to Rahim planning attack, or Rahim being determined to immediately effectuate attack.***

9. Rahim and Wright discussed the preparation of Rahim's will and plans for the distribution of his material possessions after his death. 5:18 Call, [15:15-16:25] (Ex. 4); 5:18 Transcript, at 7 (Ex. 5). ***Admitted.***

10. Rahim stated: "My objective is that I just want to meet Allah [God], because I know that, uhm, the akhirah [afterlife] is better than this dunyah [worldly life.] And uhm, since Jihad is a way out, it's a way to-to be with Allah [God], and to get out of this dunayh [worldly life]…." 5:18 Call, [17:15-18:03] (Ex. 4); 5:18 Transcript, at 7 (Ex. 5). ***Admitted.***

11. Rahim and Wright discussed the need to destroy all electronic evidence of the terrorist plot, including destroying Rahim's cell phone and restoring his laptop to its original factory settings. 5:18 Call, [14:44-14:57; 24:30-24:58] (Ex. 4); 5:18 Transcript, at 6, 9-10 (Ex. 5). ***Disputed as to destroying evidence of terrorist plot specifically.***

12. Based on Rahim's stated intention to target "those boys in blue," JTTF officers believed that Rahim was imminently preparing to commit a terrorist attack on

law enforcement officers in Boston. District Attorney's Report, at 3 (Ex. 3); Doe 2 Stmnt., at 2 (Ex. 2). ***Disputed.***

13. At approximately 6:00 a.m. on June 2, 2015, a JTTF supervisor advised John Doe 2 that Rahim was preparing to attack law enforcement that day. Due to the imminent threat to police officers and the public, the supervisor ordered John Doe 2 to ensure that Rahim did not get on a bus or other form of public transportation. District Attorney's Report, at 3 (Ex. 3); Doe 2 Stmnt., at 2 (Ex. 2). ***Disputed as to orders from JTTF supervisor.***

14. John Doe 2 relayed the order to other JTTF officers that Rahim must not be allowed to board public transportation. John Doe 2 then asked for members of the surveillance team to assemble by his vehicle to plan an operation to prevent Rahim from getting on the bus. Doe 1 Stmnt., at 3 (Ex. 1). ***Disputed.***

15. John Doe 2 was aware from prior surveillance that Rahim regularly rode the bus from Washington Street to the Forest Hills Station, which was a target-rich environment since uniformed police officers were always stationed at that location. A plan was verbally outlined to conduct a Terry stop of Rahim in an attempt to interview him. District Attorney's Report, at 4 (Ex. 3); Doe 2 Stmnt., at 2-3 (Ex. 2). ***Disputed as to JTTF agent's plans.***

16. Shortly after 7:00 a.m., JTTF officers watched Rahim leave his apartment and walk towards the CVS parking lot at 4600 Washington Street, where there was a bus stop. From previous surveillance, John Doe 2 understood that Rahim leaving his residence this early was a departure from his normal routine. District Attorney's Report, at 4 (Ex. 3); Doe 2 Stmnt., at 3-4 (Ex. 2). ***Disputed as to Rahim's normal routine.***

17. As Rahim walked toward the bus stop, he placed a call on his cellular telephone, speaking first with his brother and then to his father. Rahim began the conversation by telling his brother: "Unfortunately, you will not be seeing me again." District Attorney's Report, at 5 (Ex. 3); Recording of 06/02/2015 at 7:15 a.m. call from U. Rahim to M. Rahim ("7:15 Call") [00:51-00:56] (Ex. 7); Transcript of 06/02/2015 at 7:15 a.m. call from U. Rahim to M. Rahim ("7:15 Transcript"), at 2 (Ex. 8); Darling Decl. ¶ 11 (Ex. 6) (identifying Exhibits 7 and 8). ***Admitted.***

18. While Rahim was speaking with his father, John Doe 2 approached Rahim with his firearm holstered. John Doe 1 jogged to catch up to John Doe 2. District Attorney's Report, at 4 (Ex. 3); Doe 2 Stmnt., at 3 (Ex. 2); Doe 1 Stmnt., at 4 (Ex. 1). ***Disputed as to firearm being holstered.***

19. John Doe 2 approached Rahim in a non-confrontational manner, prominently displayed his badge, and identified himself as a BPD officer. District Attorney's Report, at 5 (Ex. 3); Doe 2 Stmnt., at 3 (Ex. 2); Doe 1 Stmnt., at 4 (Ex. 1). ***Disputed.***

20. The officers observed that Rahim was a very large man—at least 6 feet tall and weighing approximately 300 lbs. Doe 1 Stmnt., at 3 (Ex. 1); Doe 2 Stmnt., at 3 (Ex. 2). ***Disputed as to his exact size.***

21. John Doe 2 commanded Rahim to put his hands in the air. Rahim responded "Do I know you?" and immediately pulled a large military-style knife from his waist area. District Attorney's Report, at 5 (Ex. 3); Doe 2 Stmnt., at 3-4 (Ex. 2); Doe 1 Stmnt., at 4 (Ex. 1). ***Disputed as to immediately pulled a large military-style knife from his waist area.***

22. In response, John Doe 1 and John Doe 2 drew their service weapons and commanded Rahim to drop the weapon. District Attorney's Report, at 5 (Ex. 3); Doe 1 Stmnt., at 4 (Ex. 1); Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed as to weapons being drawn in response to Mr. Rahim.***

23. The officers commanded Rahim to drop the weapon no less than six times. 7:15 Call, [01:51-2:23] (Ex. 7); 7:15 Transcript, at 3-4 (Ex. 8). ***Disputed as to Rahim holding a weapon.***

24. Rahim refused to drop the knife. Instead he replied defiantly: "Why don't you drop yours! You drop yours!" 7:15 Call, [01:51-2:23] (Ex. 7); 7:15 Transcript, at 3-4 (Ex. 8). ***Disputed a to Rahim holding a knife, and replying defiantly.***

25. With the knife still in his hand, Rahim began to advance on the officers. District Attorney's Report, at 5 (Ex. 3); Doe 1 Stmnt., at 4 (Ex. 1); Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed.***

26. A surveillance camera from a nearby restaurant captured the incident from a distance and confirms that the officers backed away from Rahim while he steadily moved toward them. District Attorney's Report, at 5 (Ex. 3); 06/02/2015 Surveillance Video of Rahim ("Surveillance Video") [02:06-2:22] (Ex. 9); Declaration of Michelle Gamble ("Gamble Decl.") ¶ 14 (Ex. 10) (identifying Exhibit 9). ***Disputed as to the characterization of the surveillance video.***

27. As he continued moving toward the officers, Rahim pointed the knife at them and also waved it in a circular motion. Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed.***

28. Rahim abruptly turned toward John Doe 1, locked eyes on him, and started walking in his direction. At this time, Rahim was approximately 15 to 20 feet from John

Doe 1 but was steadily closing the distance between them. John Doe 1 realized that he was within the 21-foot zone where an individual with a knife can attack before an officer can draw and accurately fire upon the assailant before the suspect stabs him. Doe 1 Stmnt., at 4-5 (Ex. 1). ***Disputed.***

29. While backing away from Rahim, John Doe 2 observed one of the JTTF agents walking backward toward a curb that separated the CVS and Burger King parking lots, and John Doe 2 feared that if this agent fell backward onto the ground, he would not be able to stop Rahim from attacking her. John Doe 2 realized that Rahim was within the 21-foot danger zone. Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed.***

30. In the split second available to John Doe 1 to assess the threat posed by Rahim, John Doe 1 believed that Rahim posed an immediate deadly threat to himself and others based on Rahim's non-compliance with repeated commands to drop the knife; the fact that Rahim was steadily closing the distance between them; Rahim's facial demeanor which indicated his intention to do harm; and the fact that Rahim held the knife with the blade up as if he was preparing to strike John Doe 1. Doe 1 Stmnt., at 5 (Ex. 1). ***Disputed.***

31. When Rahim closed to within approximately ten feet of John Doe 1, John Doe 2 fired one round. John Doe 1 also fired two rounds as Rahim prepared to strike him. All three rounds struck Rahim, who collapsed approximately six feet from John Doe 1, still with the knife in his hand. Doe 1 Stmnt., at 5 (Ex. 1); Doe 2 Stmnt., at 4 (Ex. 2); District Attorney's Report, at 5 (Ex. 3). ***Disputed, except as to Rahim collapsing.***

32. The audio recording of the 7:15 a.m. call captured much of Rahim's interaction with the officers and strongly corroborates their description of what occurred.

***Disputed.*** One officer can be heard commanding Rahim to "Put your hands up please." ***Disputed as to officer saying "please."*** Rahim responds "Do I know you?" ***Admitted.*** Both officers then repeat the command to "Put your hands up!" Voices then immediately shout "Drop it! Drop it right now!" ***Admitted.*** The officers command Rahim to drop the weapon no less than six times, and each time Rahim responds defiantly "Why don't you drop yours!" ***Disputed as to dropping a weapon.*** "You drop yours!" Rahim then says "Come on! Why don't you shoot me?" Seconds later, gunshots can be heard in the background. 7:15 Call, [01:51-2:23] (Ex. 7); 7:15 Transcript, at 3-4 (Ex. 8). ***Admitted.***

33. JTTF officers secured the knife from Rahim, contacted Boston Emergency Medical Services, and began performing first aid. District Attorney's Report, at 5 (Ex. 3); Doe 1 Stmnt., at 5 (Ex. 1); Doe 2 Stmnt., at 4 (Ex. 2). ***Disputed.***

34. The knife recovered from Rahim at 4600 Washington Street was 13 inches long, with an eight-inch, double-edged blade. District Attorney's Report, at 3 (Ex. 3); Photograph of Knife Recovered from Rahim at 4600 Washington Street (Ex. 11); Gamble Decl. ¶ 8 (identifying exhibit 11) (Ex. 10). ***Disputed.***

35. The sworn statements of the three other JTTF agents—who were at the scene and who provided backup as John Doe 1 and John Doe 2 approached Rahim—all corroborate that he brandished a knife, ignored repeated commands to drop the weapon, steadily advanced on the officers as they retreated from him, and was between five and fifteen feet from the officers when John Doe 1 and John Doe 2 fired their service weapons. Sworn Statement of John Doe 3, at 2 (Ex. 12); Sworn Statement of John Doe 4, at 2 (Ex. 13); Sworn Statement of John Doe 5, at 2 (Ex. 14). ***Admitted.***

| | |
|---|---|
| Dated: February 20, 2019 | Respectfully Submitted<br>The Estate of Usaamah A. Rahim<br>By Its Attorneys<br><br>*/s/ Sara Attarchi*<br>_____<br>Joseph B. Simons, BBO# 684030<br>Sara Attarchi, BBO# 697486<br>SIMONS LAW OFFICE<br>1 International Place, #1400<br>Boston, MA  02110<br>(617) 544-9000<br>joe@jbsimonslaw.com<br>sara@jbsimonslaw.com |

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 20, 2019.

*/s/ Sara Attarchi*
_____
Sara Attarchi