UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ESTATE OF USAAMAH | * | |
| ABDULLAH RAHIM, by Rahimah Rahim, | * | |
| in her capacity as personal representative | * | |
| of the estate of Usaamah Abdullah Rahim, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-11152-IT |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| JOHN DOE 1, and JOHN DOE 2, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

December 2, 2020

TALWANI, D.J.

On June 2, 2015, law enforcement officers in Boston, Massachusetts, shot and killed Usaamah Abdullah Rahim. Plaintiff Rahimah Rahim,[1] in her capacity as the personal representative of Rahim's estate, filed suit against the United States, Federal Bureau of Investigation ("FBI") agent John Doe 1, and Boston police officer John Doe 2. Now pending before the court are Defendants' pre-discovery Motions for Summary Judgment [#38], [#40], [#71], contending, *inter alia*, that the individual Defendants are protected by qualified immunity and that Plaintiff cannot show an unreasonable use of force.

The court rejects Defendants' attempt to litigate this case through factual accounts that Plaintiff has not been permitted to test in discovery. And in the absence of those portions of the

---

[1] Because the plaintiff and the decedent share a last name, this memorandum will refer to the plaintiff only as "Plaintiff" and to the decedent as "Rahim" to avoid confusion.

record, Defendants have failed to demonstrate the absence of any genuine issues of material fact. Accordingly, Defendants' motions are DENIED without prejudice to renewal after Plaintiff has had an opportunity to conduct limited discovery, including depositions of individuals on whose testimony Defendants seek to rely.

## I.      Procedural History

Plaintiff alleges that the killing violated Rahim's Fourth Amendment rights pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). Am. Compl. [#22]. Plaintiff also alleges that Defendants are liable under state law for negligence, wrongful death, assault, and battery. Id.[2] The United States filed notice to substitute as the defendant for each of Plaintiff's claims against John Doe 1 except the Bivens claim, Notice [#35]; Order [#55], and as a result those claims are dismissed against John Doe 1 and are now treated as claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, against the United States. See 28 U.S.C. § 2679(d)(1).

No discovery has taken place. See Scheduling Order [#15]; Elec. Clerk's Notes [#58]. In December 2018, John Doe 2 filed a Motion to Dismiss [#36] in which he relied on facts set forth in a Report of the Suffolk County District Attorney Daniel F. Conley on Findings in the Shooting Death of Usaamah Abdullah Rahim ("District Attorney's Report") [#37-1]. The court concluded that the District Attorney's Report [#37-1] was not properly considered on a motion to dismiss, where it had been mentioned but not adopted in the Amended Complaint [#22], and denied John Doe 2's Motion to Dismiss [#36] without prejudice to John Doe 2 reasserting his legal arguments on a motion for summary judgment. See Mem. & Order [#72].

---

[2] Plaintiff subsequently confirmed that she does not seek to pursue a claim of negligence against John Doe 2. Hr'g Tr. 20:15-21:5 [#74]. See also John Doe 2's Mot. for Summ. J. 1 n.1 [#71].

Meanwhile, the United States and John Doe 1 filed the pending Motions for Summary Judgment [#38], [#40], and Statement of Undisputed Material Facts [#42], and John Doe 2 has now filed his Motion for Summary Judgment [#71], incorporating arguments and exhibits submitted by John Doe 1 in support of his Motion for Summary Judgment [#40].[3] Plaintiff has opposed the motions, see Oppositions [#52], [#53]; Statements of Material Fact [#50], [#51], [#59].[4] Plaintiff's counsel also filed an Affidavit [#52-13] seeking discovery pursuant to Fed. R. Civ. P. 56(d) and a Supplemental Affidavit [#73] clarifying the asserted need for discovery. John Doe 1 responded to the affidavit, see Resp. to Supp. Rule 56(d) Aff. [#76], and the United States and John Doe 2 joined his response, see United States Resp. to Supp. Rule 56(d) Aff. [#78]; John Doe 2's Mot. to Join Resp. to Pl's Supp. Rule 56(d) Aff. [#77]; Elec. Order [#80].

## II.    Standard of Review

Qualified immunity is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The Supreme Court has therefore "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam). A "driving force" behind

---

[3] In support of the motions, Defendants have offered: sworn statements of the individual Defendants, see John Doe 1 Statement [#42-2] and John Doe 2 Statement [#42-3]; sworn statements of three other officers, see John Doe 3 Statement [#42-13], John Doe 4 Statement [#42-14], and John Doe 5 Statement [#42-15]; the District Attorney's Report (refiled as [#42-4]); a recording of a June 2, 2015, 5:18 a.m. phone call ("5:18 a.m. Call Recording") [#42-5] and a transcript of that call ("5:18 a.m. Call Transcript") [#42-6]; a recording of a June 2, 2015, 7:15 a.m. phone call ("7:15 a.m. Call Recording") [#42-8] and a transcript of that call ("7:15 a.m. Call Transcript") [#42-9]; a June 2, 2015 surveillance video [#42-10]; and a photograph of a knife recovered at 4600 Washington Street [#42-12]. The call recordings and transcripts are authenticated by the Declaration of Timothy Darling [#42-7]. The surveillance video and photograph are authenticated by the Declaration of Michelle Gamble [#42-11].

[4] In opposition to the motions, Plaintiff has offered: a dispatch recording transcript from June 2, 2015 [#52-2]; various forensic reports [#52-3], [#52-4], [#52-5], [#52-6], [#52-7]; and the transcripts of interviews of five witnesses [#52-8], [#52-9], [#52-10], [#52-11], [#52-12].

the doctrine is to "ensure that 'insubstantial claims' against government officials be resolved prior to discovery." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)). A qualified immunity defense may thus be asserted on a motion to dismiss where the allegations of the complaint fail to state a plausible claim for relief, and if successful, may thereby avoid discovery altogether. See Ashcroft v. Iqbal, 556 U.S. 662, 684-85 (2009).

Where the allegations of the complaint, when accepted as true, do raise a plausible claim for relief, a qualified immunity defense may be raised on a motion for summary judgment. Under Rule 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party . . . [and] [a] fact is material if it has the potential of determining the outcome of the litigation." Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012) (internal citation omitted). When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court properly "give[s] no heed to speculative, unsupported, or unreasonable conclusions." Showtime Entm't, LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014). The moving party is responsible for identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to set forth "specific facts showing there

is a genuine issue for trial." <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 256 (1986).[5] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Id.</u> (emphasis original).

Generally, such a motion is brought after the parties have completed discovery. <u>See</u> <u>Celotex Corp</u>, 477 U.S. at 322 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial") (emphasis added). Nonetheless, unless a local rule or court order provides otherwise, the movant may file a summary judgment motion before discovery is complete or before it has even commenced. <u>See</u> Fed. R. Civ. P. 56(a) ("a party may file a motion for summary judgment at any time until 30 days after the close of all discovery"). However, "the party opposing the motion for summary judgment bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." <u>Celotex Corp</u>, 477 U.S. at 322.

Even if the movant meets its burden, to prevent a court from "swinging the summary judgment axe too hastily," a responding party may move pursuant to Fed. R. Civ. P. 56(d) for discovery (or additional discovery) prior to a summary judgment decision. <u>Resolution Trust</u> <u>Corp. v. North Bridge Assocs.</u>, 22 F.3d 1198, 1203 (1st Cir. 1992). Such a motion may be granted "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

_____

[5] Local Rule 56.1 requires a party opposing the motion to include a concise statement of material facts as to which it contends there exists a genuine issue to be tried.

present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "A basic tenet of [Rule 56(d)] practice is that the party seeking discovery must explain how the facts, if collected, will 'suffice to defeat the pending summary judgment motion.'" Asociacion de Periodistas de P.R. v. Mueller, 680 F.3d 70, 77 (1st Cir. 2012) (internal citation omitted). The filing party must supply the court with a statement (1) explaining her inability to adduce facts essential to filing an opposition to the summary judgment motion; (2) providing a plausible basis for believing that the sought-after facts can be assembled with a reasonable time; and (3) indicating how these facts would influence the outcome of the pending summary judgment motions. Velez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir. 2004). The court may refuse such a request if it concludes that the party opposing summary judgment is unlikely to garner useful evidence from supplemental discovery. Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

### III.    Evidence Considered on Pre-Discovery Summary Judgment

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Here, Plaintiff objects that the District Attorney's Report [#37-1] is inadmissible hearsay. Pl.'s Am. Resp to Defs' Stmt. of Undisputed Material Facts ("Pl's SOF Resp.") ¶¶ 5-6, 12-13 [#59]. John Doe 1 responds that the District Attorney's Report [#37-1] may be introduced under Fed. R. Evid. 803(A)(iii), which excludes from the rule against hearsay in a civil case the "factual findings from a legally authorized investigation" of a public office unless the opponent shows that circumstances indicate a lack of trustworthiness. John Doe 1's Reply 3-4 [#61]. The District Attorney's Report [#37-1] is not based on first-hand observations, however, and to the extent that it is offered to indirectly prove facts asserted by the individuals with first-hand knowledge of the

incident,[6] those underlying statements amount to "hearsay statements by third persons" which "are not admissible under this exception merely because they appear within public records." United States v. Mackey, 117 F.3d 24, 28 (1st Cir. 1997). Insofar as the District Attorney's Report [#37-1] is offered to show the District Attorney's understanding of what occurred, or conclusions about the officer's use of force, the report is not relevant under Fed. R. Evid. 401, or if relevant, would be excluded under Fed. R. Evid. 403 as unfairly prejudicial and confusing the issues. Accordingly, the court does not consider the District Attorney's Report [#37-1] on summary judgment.

Plaintiff further objects that she has not had an opportunity to depose the officers whose declarations have been offered. Pl's Opp. to Officers' Mots. 12 [#52]; Pl's Supp. Rule 56(d) Aff. [#73]. She argues that she should be permitted to conduct discovery prior to the court ruling on the pending motions.[7] Pl's Opp. to Officers' Mots. 12 [#52]; Pl's Supp. Rule 56(d) Aff. [#73]. She expects, based on these interviews, to uncover information contradicting Defendants' versions of events, including the reasonableness of the officers' behavior in shooting Rahim. Pl's Supp. Rule 56(d) Aff. [#73]. The government argues that the court may disregard Plaintiff's

---

[6] According to the District Attorney's Report [#37-1], the evidence reviewed included "sworn, written statements of the involved task force officers; audio-recorded interviews of civilian witnesses; video surveillance footage; police radio transmissions; ballistics analysis of the task force officers' weapons and ammunition; physical evidence from the scene, including a knife recovered at the scene; criminalistics testing and analysis; the autopsy report with supporting documentation and photographs; scene photographs; and recordings of cell phone communications between Mr. Rahim and identified parties known to investigators." District Attorney's Report 2 [#37-1]. The investigation also included review of the "FBI Inspector's Report – Agent Involved Shooting Boston Field Office June 2, 2015," and other reports. Id.

[7] More broadly, she requests the opportunity to depose or interview the law enforcement officers present during the shooting, John Doe 1 and John Doe 2, civilian witnesses, and any supervisors involved in the plan to stop and seize Rahim. Pls' Rule 56(d) Aff. [#52-13]; Pl's Supp. Rule 56(d) Aff. [#73]. The court notes that the District Attorney's Report [#37-1] proffered by Defendants appears to have been based on statements from these same individuals.

"speculation" that the evidence requested will contradict the evidence currently in the summary judgment record. John Doe 1's Mem. in Support of Mot. for Summ. J. ("John Doe 1's Mem.") 21 [#41] (citing DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)). But the threshold question that the court must consider is whether the evidence offered by Defendants is properly part of the summary judgment record.

Rule 56 allows affidavits or declarations to be used to support or oppose a motion where they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Defendants do not claim that they would be permitted to testify to these matters at trial without cross-examination, but they nonetheless contend that they may offer such untested affidavits here. See United States Mem. in Support of Mot. for Summ. J. ("U.S. Mem.") 12 [#39]; John Doe 1's Mem. 21 [#41]. They rely on case law suggesting that a Plaintiff has no cause to complain where she has not produced affirmative evidence that an officer is lying. See, e.g., U.S. Mem. 12 [#39] (quoting Mitchell v. Miller, 790 F.3d 73, 79 n.4 (1st Cir. 2015)) ("'A genuine dispute as to a material fact cannot be created by relying on the hope that the jury will not trust the credibility of the witness. There must be some affirmative evidence that the officer is lying.'"); John Doe 1's Mem. 21 [#41] (citing Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007) ("plaintiff could not defeat summary judgment merely with arguments that 'there is no evidence the officers were not lying in giving their versions of the events,' since 'there is no evidence that they were lying'"). But in these cases, the officers were deposed before their testimony was offered on summary judgment. See Mitchell, 790 F.3d at 79; Berube, 506 F.3d at 83. As the Supreme Court explained in Anderson v. Liberty Lobby Inc., 477 U.S. at 256-57, on which Defendants also rely, a plaintiff may not defeat a summary judgment motion by arguing that the jury might not believe the

8

defendant, even where evidence is likely to be within the possession of the defendant, "as long as the plaintiff has had a full opportunity to conduct discovery." Accordingly, the court concludes that Defendants may offer affidavits on summary judgment only after Plaintiff has had an opportunity to depose the affiants, and the untested affidavits may not be relied upon here.

### IV.    Factual Background

For purposes of summary judgment, drawing all possible inferences in Plaintiff's favor, and having sustained Plaintiff's objections to Defendants' proffered evidence as set forth above, the court finds the facts as follows.

Defendant John Doe 1 is a Special Agent in the Boston Field Office of the FBI. Pl's SOF Resp. ¶ 1-2, 4 [#59]. Defendant John Doe 2 is a Detective for the Boston Police Department. Id. at ¶ 2. In the spring of 2015, John Doe 1 and John Doe 2, along with other members of the FBI Joint Terrorism Task Force ("JTTF") were investigating Rahim for alleged ties to the Islamic State of Iraq and the Levant ("ISIL"), a foreign terrorist organization. Id. at ¶ 4.

On June 2, 2015, at 5:18 a.m., the JTTF intercepted a phone call between Rahim and David Wright. Id. at ¶ 7. During the call, Rahim told Wright that he needed to "act sooner than anticipated" and that he could not wait until the Fourth of July. 5:18 a.m. Call Transcript 1-2 [#42-6]. Rahim said that he was not trying to go to New York but was "gonna be on vacation, right here in Massachusetts." Id. at 3. He also stated that he was "going after them, those boys in blue" because they were "the easiest target" and that he would "make it to jannah [paradise], because this dunyah [worldly life] is not worth it, it's not worth it." Id. at 4 (translation provided in transcript). Rahim told Wright that it would be "local," that it would be "if not today, then tomorrow," that it "might even happen today," and that he did not want to "give it another day." Id. at 4-5, 9. He also said, "if I can meet my Lord sooner than that, why should I have to wait a month?" Id. at 5. He told Wright:

> My objective is that I just want to meet Allah [God], because I know that . . . the akhirah [afterlife] is better than this dunyah [worldly life.] And . . . since Jihad is a way out, it's a way to-to be with Allah [God], and to get out of this dunayh [worldly life], and you know, maybe to be amongst the company of the righteous. . . . And I already gave my bi'ah [allegiance], so it's not a random vigilante attack. It is what it is; I have my bases covered.

Id. at 7. Rahim also said that this would be his last day of work. Id. at 6. Rahim and Wright discussed Rahim's will and the distribution of his possessions, as well as how to destroy his cell phone and the data on his laptop. Id. at 6-7, 9-10. The conversation ended with Rahim stating that he would not go into work that day and would instead get ready and bring money over to Wright at his apartment. Id. at 11.

A call was made to police dispatch asking for "a few marked cars," explaining that "we need some detectives. We're going to stop a guy armed with a knife." Dispatch Recording Transcript 2 [#52-2]. The caller also noted that "[t]here's six undercover officers there, plain clothes officers." Id. at 3. The caller then told police dispatch "we're going to stand down on that for now. If we can just get a couple of cars in the area . . . be in the area, stay back." Id.

Boston police officer John Doe 2 relayed an order to other JTTD officers that Rahim was not to be allowed to board public transportation. Pl's SOF Resp. ¶ 14 [#59]. John Doe 2 then asked members of the surveillance team to assemble by his vehicle to plan an operation to prevent Rahim from getting on the bus. Id.

At some point, however, the officer calling dispatch asked to have units "stay just short of the Burger King and keep an eye on the bus stop that's right in front of the CVS sign." Dispatch Recording Transcript 6 [#52-2]. The officer then stated: "If our subject is making his way here now, we're going to take him out at that spot. We'll just need them to come up for backup. It will be plain clothes units, about four, taking a black male right in front of that bus stop, and that should be happening in the next few minutes." Id. (emphasis added).

10

Rahim spoke on the phone as he walked towards the bus stop.[8] Pl's SOF Resp. ¶ 18
[#59]. John Doe 2 approached Rahim, and, at the same time, John Doe 1 and other officers
jogged to catch up with John Doe 2. Id.; Surveillance Video [#42-10]. Rahim was still on the
phone, and the following interaction was recorded:

> Officer 1: "Put your hands up please."

> Rahim: "Do I know you?"

> Officer 1: "Put your hands up!"

> Officer 2: "Put your hands up."

> Officer 1: "Drop it! Drop it right now!"

> Rahim: "Why don't you drop yours?"

> Officer 1: "Drop it!"

> Rahim: "Why don't you drop yours?"

> Officer 1: "Drop it!"

> Rahim: "Why don't you drop yours?"

> Officer 1: "Drop it!"

> Rahim: "Why don't you drop yours?"

> Officer 1: "Drop it!"

> Rahim: "Drop yours!"

> Officer 1: "Drop it!"

> Rahim: "Drop yours!"

---

[8] Defendants offer evidence that, during his walk, Rahim spoke first with his brother and then
with his father. Pl's SOF Resp. ¶ 17 [#59]. Rahim told his brother "unfortunately, you will not be
seeing me again." Id. However, there is no evidence in the record that the officers on the scene
were aware of the content of those conversations at the time of the events at issue here.

Officer 1: [nintelligible]

Rahim: "Drop yours!"

Rahim: "Drop yours!"

Officer 1: [Unintelligible]

Rahim: "Drop yours!"

Officer 1: [Unintelligible]

Rahim: "[Unintelligible] over here. Come on! Won't you shoot me?"

[Shooting sounds]

7:15 a.m. Call Recording [#42-8]; 7:15 a.m. Call Transcript [#42-9]. [9]

Although the surveillance video footage is from some distance away and not terribly clear, it could be understood to depict the officers closing in on and surrounding Rahim, and that at the end of the interaction, Rahim was walking (but not lunging) towards one or more of the officers. Surveillance Video [#42-10]. At that point, John Doe 2 fired one shot at Rahim, and John Doe 1 fired two rounds. Pl's SOF Resp. ¶ 31 [#59]. All three rounds struck Rahim, and he collapsed. Id.

Plaintiff submitted statements taken by the police from five civilian witnesses. Witness A, a ten-year-old child, woke up to shouts of "put your hands up" and then heard two gunshots, at which point he looked out his window and saw someone fall to the ground. Witness A Stmt. 2:7; 8:20-9:25; 11:18-13:25 [#52-8]. Witness B, a worker in a nearby office, saw police approach

---

[9] Defendants claim that Rahim continued to walk towards the officers, pointing his knife and waving it in a circular motion, while the officers backed away. Pl's SOF Resp. ¶¶ 25-30 [#59]. They also assert that this is visible in the video captured by a nearby surveillance camera. Surveillance Video [#42-10]. Plaintiff disputes that Rahim was holding a knife, that he continued to approach the officers, and that Defendants accurately characterized the video. Pl's SOF Resp. ¶¶ 25-30 [#59].

a man with their guns drawn and form a half circle around him, then watched the man walk towards officers before he was shot. Witness B Stmt. 2:20-22; 4:10-5:15; 14:10-15:15 [#52-9]. Witness B did not see anything in the man's hands but did see officers throw something away from him after he was shot. Id. at 5:16-23. Witness C heard a gunshot while walking into a Dunkin' Donuts. Witness C Stmt. 3:10-13; 6:6-16 [#52-10]. He took cover, and when he looked out to see what was happening, he saw a man on the ground and did not see a knife. Id. at 9:8-10:7; 19:10-20. Witness D, another worker in a nearby building, saw police circled around a man and stated that Rahim continued to walk in the parking lot with his hands down towards some of the officers. Witness D Stmt. 3:12-21; 10:11-18 [#52-11]. He saw police walk in front of and behind the man and then saw the shooting, stating that police then "moved something from his hand and threw it away." Id. at 4:1-11. Witness E, an off-duty police officer driving past the scene, saw officers surrounding the man during the confrontation and shouting at him. 4:11-24 [#52-12]. Witness E heard the gunshots moments later. Id. at 5:1-5. He then pulled over to assist fellow officers. Id. at 5:22-6:5.

## V.    Discussion

### A.    *Bivens* Claims

Plaintiff seeks damages from Defendants, alleging that John Doe 1 and John Doe 2 violated Rahim's Fourth Amendment right to be free from unreasonable seizure. Pl's Opp. to Officers' Mots. 9-11 [#52]. Defendants move for summary judgment, asserting that John Doe 1 and John Doe 2 are entitled to qualified immunity because (1) their actions were reasonable and therefore not a violation of Rahim's constitutional rights and (2) even if they did violate Rahim's constitutional rights, those rights were not "clearly established" at the time of the shooting. John Doe 1's Mem. 11-20 [#41]. The court considers these arguments in turn.

     1.     Fourth Amendment Violation

Under Bivens, 403 U.S. at 396-97, a plaintiff has an implied cause of action for constitutional violations committed by federal officials. A Bivens claim is analogous to one brought against state officials under 42 U.S.C. § 1983.[10] See Soto Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011).

Plaintiff's Bivens claims are premised on the idea that John Doe 1 and John Doe 2 used excessive force in seizing Rahim and thereby violated his Fourth Amendment rights. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." Plumhoff v. Rickard, 572 U.S. 765, 774 (2014). Determining the reasonableness of a particular seizure "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989). "The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." Tennessee v. Garner, 471 U.S. 1, 10 (1986). Given the magnitude of this individual interest, the law in this circuit has long been clear that "deadly force . . . is reasonable (and, therefore, constitutional) only when '*at a minimum*, a suspect poses an immediate threat to police officers or civilians.'" McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (quoting Jarrett v.

---

[10] John Doe 2 was a Boston police officer at the time of the events at issue. He was working as a member of a federal task force, however, and Plaintiff's claim against him is brought under Bivens, rather than under § 1983. John Doe 2 does not disagree that Bivens provides the appropriate framework. Where the parties treat the suit as lying under Bivens, the court analyzes the constitutional claims against John Doe 2 under that framework. See DeMayo v. Nugent, 517 F.3d 11, 14 n.5 (1st Cir. 2008).

Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam)) (emphasis added). In addition, when feasible, a warning must be given before deadly force is employed. Id. at 82 (citing Garner, 471 U.S. at 11-12; Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005)).

The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. This "calculus of reasonableness," id., is "comparatively generous" to officers facing "potential danger, emergency conditions or other exigent circumstances" and affords them "a fairly wide zone of protection." Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994). And in borderline cases, "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has . . . a plausible claim that the situation could better have been handled differently." Id.

Defendants argue that the officers had information that Rahim was likely armed with a knife, they repeatedly ordered him to drop his weapon, and he was close enough to be a threat to officer safety. U.S. Mem. 10-11 [#39]. This, they argue, is precisely "the type of 'split-second judgment' police officers are forced to make, and which [courts] must take into account in assessing an officer's actions." McGrath v. Tavares, 757 F.3d 20, 28 (1st Cir. 2014).

But this was not a sudden, unexpected altercation. Taking the evidence in the light most favorable to Plaintiff, Defendants, who had been instructed to surveil Rahim and to prevent him from boarding a bus, announced to dispatch that they were going to take Rahim out if he arrived at the bus stop. Once he arrived there, they approached Rahim with guns drawn and did not

identify themselves.[11] An examination of reasonableness must be sensitive not just to the split-second decision made by officers in the apparently life-threatening situation but also to the less hurried decisions made leading up to that moment. See Young, 404 F.3d at 22 (quoting St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995) ("police officers' actions for our purposes need not be examined solely at the 'moment of the shooting'")). See also Pauly v. White, 874 F.3d 1197, 1219 (10th Cir. 2017), vacated on other grounds, 137 S. Ct. 548, 552 (2017) ("Our precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force") (internal quotations and alterations omitted); Estate of Starks v. Enyart, 5 F.3d 230, 234 (7th Cir. 1993) ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force").

If the court were to consider only the moment of the shooting, Defendants would be correct that they have met their burden for Plaintiff to respond and that no new evidence would likely change the outcome. But "[e]verything depends on context." McKenney, 873 F.3d at 82. "The rule in this circuit is that . . . 'the court should examine the actions of the government officials leading up to the seizure.'" Young, 404 F.3d at 22 (quoting St. Hilaire, 71 F.3d at 26). And while the court is properly precluded from second-guessing the actions of police officers after the fact, see Hegarty v. Somerset Cty., 53 F.3d 1367, 1377 (1st Cir. 1995), the court is not

---

[11] Although Defendants claim that John Doe 2 identified himself to Rahim, Pl's SOF Resp. ¶ 19 [#59], they also announced to dispatch that the plain-clothed officers would be approaching Rahim, and Rahim's response to John Does 2's approach—"Do I know you?"—would be consistent with John Doe 2 not identifying himself.

required to pretend that crucially important events leading to the use of deadly force did not occur.

While "[t]here is no Constitutional requirement that the police use the least intrusive means available to respond to a situation, . . . the availability and feasibility of non-lethal force options is a factor that courts consider in assessing the reasonableness of a use of deadly force." McKenney v. Mangino, No. 2:15-CV-00073-JDL, 2017 WL 1365959, at *13 (D. Me. Apr. 12, 2017), aff'd in part, appeal dismissed in part, 873 F.3d at 78. Moreover, "[a] determination of objective reasonableness 'will often require examination of the information possessed' by the defendant officials." Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002) (quoting Anderson v. Creighton, 483 U.S. at 641). Here, Defendants have offered no admissible evidence regarding (1) the information the officers possessed at the moments leading up to the shooting beyond the statement to dispatch that Rahim was armed with a knife or (2) the officers' plans, actions, observations, and means available to respond to the situation from the time John Doe 2 asked members of the surveillance team to assemble by his vehicle to plan an operation through the time it was relayed to dispatch that the undercover officers would "take [Rahim] out" if he made his way to the bus stop.

Defendants argue that St. Hilaire is no longer good law after County of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546-47 (2019), which they contend stands for the proposition that the reasonableness inquiry is focused on an officer's actions at the precise moment deadly force was used. But the Supreme Court's holding in Mendez was limited to rejecting the Ninth Circuit's so-called "provocation rule" which allowed inquiry into a *separate* constitutional violation when considering the use of force: "All we hold today is that *once* a use of force is deemed reasonable under Graham[, 490 U.S. at 396], it may not be found unreasonable by reference to some

separate constitutional violation." 137 S. Ct. at 1547 n*. As another district court has summarized, the Supreme Court did not decide the propriety of considering "unreasonable police conduct prior to the use of force that foreseeably created the need to use it." Arnold v. City of Olathe, Kansas, 413 F. Supp. 3d 1087, 1106 (D. Kan. 2019).

In sum, where Plaintiff has not had the opportunity to cross-examine the witnesses on whose testimony Defendants rely, and where no discovery that might provide facts bearing on the reasonableness of Defendants' conduct in the totality of the circumstances has been permitted, the court cannot, at this time, find that Defendants "ha[ve] met [their] burden of coming forward with proof of the absence of any genuine issues of material fact," Celotex Corp, 477 U.S. at 322, as to whether Defendants violated Rahim's constitutional right to be free from an unreasonable seizure.

2.      Clearly Established Rights

This does not end the court's analysis, however, as the doctrine of qualified immunity protects government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1852)). When a defendant asserts a qualified immunity defense, the plaintiff must meet a heavy two-part burden showing that, viewing all of the facts in her favor, no reasonable jury could find (1) that the defendants violated the plaintiff's—in this case, the decedent's—constitutional rights and (2) that the allegedly abridged right was "clearly established" at the time of the claimed misconduct. Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018). Here, the court has already found that further discovery is necessary to determine whether Defendants acted unreasonably and therefore violated Rahim's

Fourth Amendment rights.[12] The court therefore turns to the issue of whether the alleged right was clearly established at the time of the shooting. Specifically, the question is whether, under the circumstances, Rahim's right to be free from deadly force was clearly established.

This question, too, has two parts. The plaintiff must (1) identify either controlling authority or a consensus of persuasive authority sufficient to put the officer on notice that his conduct fell short of the constitutional norm and (2) demonstrate that an objectively reasonable officer would have known that his conduct violated the law. Id. The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality," Mullenix v. Luna, 577 U.S. 7, 16 (2015) (quoting Ashcroft, 563 U.S. at 742), and that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts,'" id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)). So, although a plaintiff need not point to applicable precedent when "the unlawfulness of the officer's conduct is sufficiently clear," Dist. of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018), "existing precedent must have placed the statutory or constitutional question beyond debate," White, 137 S. Ct. at 552 (2017) (quoting Mullenix, 577 U.S. at 11). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotation marks and citation omitted).

---

[12] The First Circuit has stated that while "[i]n theory, substantive liability and qualified immunity are two separate questions," in the context of police misconduct cases, "the Supreme Court has used the same 'objectively reasonable' standard in describing both the constitutional test of liability and the Court's own standard for qualified immunity." Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (citing Graham, 490 U.S. at 397; Anderson v. Creighton, 483 U.S. at 639) (internal citations omitted).

What the law does or does not clearly establish for purposes of assessing qualified immunity is a question of law. See Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017). But factual issues are an inherent part of the analysis; the Supreme Court has instructed courts that "the dispositive question is 'whether the violative nature of [the] *particular* conduct is clearly established,'" Mullenix, 577 U.S. at 12 (quoting Ashcroft, 563 U.S. at 742) (emphasis original), and that the "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" id. (quoting Brosseau, 543 US at 198). In a case like this one, where the court has found the facts on summary judgment insufficient to determine exactly what the particular conduct was, let alone whether it violated Rahim's constitutional rights, the court cannot fairly rule on the immunity defense. See Tolan v. Cotton, 572 U.S. 650, 657 (2014) (holding that even when "a court decides only the clearly-established prong of the standard," it "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions"). Summary judgment is therefore premature. Defendants may renew their motions after Plaintiff has had an adequate opportunity to conduct limited discovery that is narrowly tailored to uncover facts that the court needs to rule on the issue of qualified immunity. See Anderson v. Liberty Lobby Inc., 477 U.S. at 250 n.5 (noting that summary judgment may be refused "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition").

B.      *State Law Claims*

In addition to the Bivens claims, Plaintiff brings three intentional tort claims—for wrongful death, assault, and battery—against the United States and John Doe 2 and a negligence claim against the United States.

1.   Intentional Tort Claims

Under Massachusetts law, a court's "determination of the reasonableness of the force used" as to constitutional claims controls the "determination of reasonableness of force used under the common law assault and battery claims." Raiche v. Pietroski, 623 F.3d 30, 40-41 (1st Cir. 2010). See also LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 143 (D. Mass. 2007) ("Because the Court has already determined that the force used by Defendants was objectively reasonable for excessive force purposes, it concludes that plaintiff's assault and battery charge cannot be sustained"); Berube, 506 F.3d at 85 (finding reasonableness analysis on § 1983 claim dispositive for state law civil rights claim). This is also true for a wrongful death claim brought under Mass. Gen. Laws ch. 229, § 2(2). See McGrath v. Tavares, 93 Mass. App. Ct. 1115, at *2 (Jun. 20, 2018) (unpublished). With respect to the United States' liability under the FTCA, the government "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

The United States and John Doe 2[13] argue that they should be granted summary judgment because, as under the Bivens analysis, the officers' conduct was objectively reasonable. But, as discussed above, considering only the properly supported evidence in the light most favorable to Plaintiff, Defendants have not met their burden of demonstrating that there is an absence of any issue of material fact regarding the reasonableness of the officers' conduct. Summary judgment is therefore premature.

---

[13] John Doe 2 made this argument in support of his original Motion to Dismiss [#36] and has incorporated John Doe 1's argument into his summary judgment motion. See Mem. in Supp. of Mot. to Dismiss 12 [#37]; John Doe 2's Mot. for Summ. J. 2 [#71].

2.   Negligence

The United States asserts that the court lacks jurisdiction over the negligence claim under the FTCA's discretionary function exception.

The doctrine of sovereign immunity shields the federal government from suit unless it expressly waives that immunity. See United States v. Mitchell, 445 U.S. 535, 538 (1980). The FTCA, 28 U.S.C. § 2671, *et seq*., is a limited waiver of sovereign immunity that permits plaintiffs to bring claims against the United States for certain common law torts committed by its employees.[14] However, the "discretionary function exception" bars liability if the claim is "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved is abused." 28 U.S.C. § 2680(a).

Plaintiff argues that 28 U.S.C, § 2680(h) "was meant to broaden liability under the FTCA and therefore should not be limited by the provisions of subsection (a)." Pl's Opp. to United States 9 [#53] (citing Nguyen v. U.S., 556 F.3d 1244, 1251-53 (11th Cir. 2009)). But the interplay of subsection (a) and subsection (h) is not at issue here, where Plaintiff's negligence claim is not one of claims listed in 28 U.S.C § 2680(h). Accordingly, the court turns directly to § 2680(a).

In analyzing whether the exception applies, the court first "identif[ies] the particular conduct giving rise to the claims at issue." Limone v. United States, 579 F.3d 79, 101 (1st Cir. 2009). Next, the court determines whether the federal employee was engaged in conduct that was

---

[14] The FTCA authorizes tort claims only against the United States itself; it expressly shields individual federal employees from personal liability for torts committed within the scope of their employment. See 28 U.S.C. § 2679(b)(1).

(1) discretionary and (2) policy-driven. See Mahn v. United States, 742 F.3d 11, 14 (1st Cir.

2012). A discretionary act is one that involves "an element of judgment or choice." Berkovitz v.

United States, 486 U.S. 531, 536 (1988). The exception therefore does not apply if a "federal

statute, regulation, or policy specifically prescribes the course of action for an employee to

follow." Id. And where a federal employee has discretion, there is a presumption that actions

exercising that discretion are grounded in policy. See Shansky v. United States, 164 F.3d 688,

690 (1st Cir. 1999). "[I]f the challenged conduct is both discretionary and policy-driven," then

the FTCA does not waive sovereign immunity with respect to the employee's conduct, and the

claim fails. Gordo-Gonzalez v. United States, 873 F.3d 32, 36 (1st Cir. 2017).

 Here, Plaintiff's negligence claim asserts that Defendants "failed to approach [Rahim] in

a safe manner," that they instead "approached him in public, with weapons drawn," and that as a

result of the "planning" and "operational aspects" of their acts and inactions, foreseeable events

occurred, including the assault, battery, and fatal shooting and wrongful death of Mr. Rahim."

Am. Compl. ¶¶ 61-63 [#22]; see also Pl's Opp. to United States 9 [#53]. If Plaintiff's proof

tracks these allegations only, the officers' actions are discretionary, and the claim is barred.

 Plaintiff argues that liability is not barred if the officers' conduct was "unconstitutional,

proscribed by statute, or exceeded the scope of the agent's authority." Id. 4, 7-8 (quoting Litif v.

United States, 682 F. Supp. 2d 60, 81 (D. Mass 2010), aff'd 670 F.3d 39 (1st Cir. 2012), (quoting

Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003))). She has

made neither arguments nor allegations that the officers' conduct was proscribed by statute or

exceeded the scope of their authority. Plaintiff does allege that the officers had an "affirmative

duty . . . to ensure that [Rahim] was protected from an [unconstitutional] seizure," that they

failed to approach Rahim in a safe manner, that this conduct was a material element and

proximate cause in bringing about Rahim's seizure and death, and that the officers' actions were not objectively reasonable in light of the circumstances. For the reasons discussed above, the summary judgment record is not sufficient to preclude this claim. And if Plaintiff is able to show that the officers' conduct violated Rahim's constitutional rights and was not objectively reasonable, the negligence claim is not barred by the discretionary function exception. At the same time, if Plaintiff can make such a showing, the negligence claim will be redundant, reaching no other conduct than that found actionable under her <u>Bivens</u> and intentional tort claims.

### VI.   Conclusion

For the forgoing reasons, the United States' <u>Motion for Summary Judgment</u> [#38], John Doe 1's <u>Motion for Summary Judgment</u> [#40], and John Doe 2's <u>Motion for Summary Judgment</u> [#71] are DENIED without prejudice to renewal after limited discovery.

The clerk shall set a scheduling conference. Counsel shall be prepared to discuss the appropriate scope of discovery.

IT IS SO ORDERED.

December 2, 2020                                    /s/ Indira Talwani
                                                           United States District Judge